BRETT SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

CHARLES J. BUTLER
Assistant Director
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 683
Washington, DC 20044
(202) 514-6062
Charles.J.Butler@usdoj.gov

*Counsel for the United States*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TRI-STATE MEMORIAL HOSPITAL, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No. 2:25-cv-00181-TOR <br><br> **UNITED STATES' ANSWER TO FIRST AMENDED COMPLAINT** |

The United States responds to Plaintiff Tri-State Memorial Hospital's First Amended Complaint as follows:

**Complaint Paragraph 1:** In March 2020, the federal government enacted the CARES Act to aid businesses and individuals in response to the unprecedented

ANSWER TO FIRST AMENDED COMPLAINT          1

public health crisis caused by the COVID-19 pandemic. The CARES Act was passed with large bipartisan support in Congress and was signed into law by President Trump.

**Answer:** Admits.

**Complaint Paragraph 2:** The CARES Act created the Employee Retention Credit ("ERC") for employers who continued to pay qualified wages to their employees during 2020 and 2021. The statute created a tax credit against applicable employment taxes for each calendar quarter in which a business was eligible. *See* CARES Act § 2301(a); I.R.C. § 3134(a).

**Answer:** Admits.

**Footnote 1:** *See* the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), as amended by § 206 and § 207 of the Taxpayer Certainty and Disaster Tax Relief Act (hereinafter the "Relief Act"), enacted as Division EE of the Consolidated Appropriations Act of 2021 Pub. L. No. 116-260, 134 Stat. 3038 (2020) (hereinafter, "Consolidated Appropriations Act"), and American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 8 (2021) (codified at I.R.C. § 3134) (hereinafter, "American Rescue Plan Act") (providing extensions through January 1, 2022).

**Answer:** Footnote 1 consists of citations to statutes and does not require a response.

**Complaint Paragraph 3:** According to the United States Department of the Treasury, the department to which the Internal Revenue Service ("IRS") belongs, the CARES Act and the Coronavirus Response and Consolidated Appropriations Act of 2021 "provided fast and direct economic assistance for American workers, families, small businesses, and industries."

ANSWER TO FIRST AMENDED COMPLAINT          2

**Answer:** The United States admits that the IRS is a bureau of the Department of Treasury. The United States lacks sufficient information to admit or deny the remaining allegations in paragraph 3.

**Footnote 2:** U.S. Dep't of the Treasury, *About the CARES Act and the Consol. Appropriations Act*, (last visited Aug. 19, 2024), https://home.treasury.gov/policyissues/coronavirus/about-the-cares act#:~:text=U.S.%20Department%20of%20the%20Treasury,-Search&text=The%20Coronavirus%20Aid%2C%20Relief%2C%20and,%2C%20small%20businesses%2C%20and%20industries.

**Answer:** Footnote 2 appears to cite a webpage that no longer exists and does not require a response.

**Complaint Paragraph 4:** Tri-State qualified for the ERC under the text of the CARES Act and applied for a refund with the IRS. After a lengthy delay, the IRS has failed to process Plaintiff's claims for an ERC refund.

**Answer:** The United States admits that Tri-State applied for an ERC refund and denies that the IRS engaged in a lengthy delay. The United States lacks sufficient information to admit or deny the remaining allegations in paragraph 4.

**Complaint Paragraph 5:** Tri-State brings this lawsuit to obtain the credits it is entitled to receive under the CARES Act.

**Answer:** The United States admits that Tri-State brings this suit to obtain ERCs. The United States otherwise lacks sufficient information to admit or deny the allegations in paragraph 5.

**Complaint Paragraph 6:** The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1340 and 1346, I.R.C. § 7422, and 5 U.S.C. §§ 702, 704, and 706.

ANSWER TO FIRST AMENDED COMPLAINT          3

**Answer:** The United States admits that, if Tri-State duly filed claims for refund with the IRS and otherwise met jurisdictional prerequisites, the Court has jurisdiction under 28 U.S.C. §§ 1340 and 1346(a)(1). The United States otherwise denies the allegations in paragraph 6.

**Complaint Paragraph 7:** Venue is proper under 28 U.S.C. § 1391(e)(1) and § 1402 because Tri-State maintains its principal place of business and/or principal office in this district in Clarkston, Washington and a substantial part of the events giving rise to this action occurred in this district.

**Answer:** Admits.

**Complaint Paragraph 8:** Tri-State is a nonprofit corporation organized in the State of Washington with its principal place of business in Clarkston, Washington. Tri-State Memorial Hospital was originally incorporated on November 6, 1947, as Asotin County Memorial Hospital, Inc. Tri-State Health operates as a not-for-profit healthcare provider, delivering a broad spectrum of medical services, including primary and specialty care, surgical procedures, outpatient services, and wellness initiatives. Tri-State's mission is to provide high quality healthcare throughout the Clarkston community and beyond.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 8.

**Complaint Paragraph 9:** The United States of America is the Defendant.

**Answer:** Admits.

**Complaint Paragraph 10:** In the beginning of 2020, COVID-19 swept through the United States and the federal, state, and local governments issued historically unprecedented orders to stem the spread of the disease. They issued lockdowns,

ANSWER TO FIRST AMENDED COMPLAINT          4

required businesses to use Personal Protective Equipment (PPE), restricted group gatherings, added restrictions on health care providers, and forced business closures. Those orders had an expected side effect—they exacerbated the already substantial disruptions to the economy from the pandemic.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 10.

**Complaint Paragraph 11:** Congress swiftly acted to mitigate the economic fallout from widespread business impairments and job losses stemming from COVID-19 and government orders. In March 2020, Congress enacted the CARES Act.

**Answer:** The United States admits that in March 2020, Congress enacted the CARES Act. The United States lacks sufficient information to admit or deny the remaining allegations in paragraph 11.

**Complaint Paragraph 12:** The CARES Act provided sweeping economic support. As articulated by several members of Congress, one of the primary goals of the CARES Act was to provide billions in assistance to businesses so they could keep workers on their payrolls. Along with the ERC, the CARES Act authorized direct payments to households and businesses on expedited timelines through emergency measures such as the Paycheck Protection Program (PPP) and Economic Impact Payments. *See* CARES Act §§ 1102, 6428.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in the first sentence of paragraph 12. The United States admits the remaining allegations in paragraph 12.

**Footnote 3:** *See, e.g.*, 166 Cong. Rec. S1897 (2020) (Sen. Collins explaining that the sponsoring Senators "kept in mind the common goal of protecting those employees . . . who are at risk of being laid off because of the cashflow problems of their employers" and had the "joint vision . . . to help small businesses and their

ANSWER TO FIRST AMENDED COMPLAINT          5

employees make it through to the other side of this crisis by providing cashflow assistance quickly to employers who agree to keep their workers on the payroll"); 166 Cong. Rec. E347 (2020) (Rep. Adams explaining that she supported the CARES Act "because it provides billions in assistance to our number one job creators, our small businesses, as they look to make payroll and keep their workers employed"); 166 Cong. Rec. E343 (2020) (Rep. Crist voicing his support of the CARES Act because it "provides over $350 billion for small businesses on Main Street in grants, forgivable loans, and tax credits so they can make payroll and pay monthly bills to keep their businesses afloat").

**Answer:** Footnote 3 appears to quote from the Congressional Record and does not require a response.

**Complaint Paragraph 13:** The ERC program was a significant part of the CARES Act and central to accomplishing the Act's goal of encouraging businesses to keep workers on their payrolls. The ERC program created a tax credit for employers who were adversely affected by COVID-19 but nonetheless continued to pay qualified wages, including some health plan expenses, to their employees. *See* CARES Act § 2301; I.R.C. § 3134(c)(3); FS-2020-05 (May 2020). By helping businesses maintain their employees, the ERC program also sought to lower enrollments in public assistance programs—like Unemployment Insurance and Medicaid—by people who might lose their jobs.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in the first and third sentences of paragraph 13. The United States admits the allegations in the second sentence.

**Footnote 4:** *See also* U.S. Dep't of the Treasury, *Emp. Retention Tax Credit: What You Need to Know,* (last visited Aug. 19, 2024), https://home.treasury.gov/system/files/136/Employee-Retention-Tax-Credit.pdf.

**Answer:** Footnote 4 cites a link to a document and does not require a response.

ANSWER TO FIRST AMENDED COMPLAINT          6

**Complaint Paragraph 14:** To ensure the program's effectiveness, Congress made the ERC program widely available. Congress amended the CARES Act to require the IRS to conduct a public information campaign about the program in coordination with the Small Business Administration to encourage businesses to participate. *See* Relief Act § 207(i) (requiring government "outreach" to businesses by giving "notice about the credit allowed under this section and the requirements for eligibility to claim the credit"). It amended the Act to retroactively remove certain categorical bars on ERC eligibility for qualifying quarters in 2020. *See* Relief Act § 206. It also amended the CARES Act to relax the program's eligibility requirements and increase the amount of the credit for qualifying quarters in 2021. *See* Relief Act § 207(b), (d).

**Answer:** The United States lacks sufficient information to admit or deny the allegations in the first sentence of paragraph 14. The United States admits the remaining allegations in paragraph 14.

**Footnote 5:** *See also* U.S. Dep't of the Treasury, *Treasury Encourages Bus. Impacted by COVID-19 to Use Emp. Retention Credit* (Mar. 31, 2020), https://home.treasury.gov/news/press-releases/sm962.

**Answer:** Footnote 5 cites a Treasury press release and does not require a response.

**Footnote 6:** *See also* IRS Notice 2021-20(II.)(A.) (Mar. 1, 2021) ("Section 206 of the Relief Act amended section 2301 of the CARES Act to permit an employer that received a PPP loan to be eligible to claim an employee retention credit under section 2301 of the CARES Act . . . , effective retroactive to the original effective date of the CARES Act.").

**Answer:** Footnote 6 cites to a Treasury press release and does not require a response.

ANSWER TO FIRST AMENDED COMPLAINT        7

**Complaint Paragraph 15:** The original CARES Act, signed into law in March 2020, provided a tax credit equal to 50% of qualified wages paid to employees, up to a maximum of $10,000 per employee of qualified wages for the year 2020.
**Answer:** Admits.

**Complaint Paragraph 16:** In late 2020, the CARES Act was amended to raise the credit and extend its duration. The amendment allowed eligible employers to claim 70% of the qualified wages paid with a cap of $10,000 per employee of qualified wages for each calendar quarter. Relief Act § 207(b); *see also* I.R.C. § 3134(a), (b)(1)(A). This increased credit was extended to the first and second quarters of 2021, and eventually through the third quarter of 2021. Relief Act § 207(a); American Rescue Plan Act (providing further relief of 70% of a cap of $10,000 for the third and fourth quarters of 2021).
**Answer:** Admits.

**Complaint Paragraph 17:** In sum, an eligible employer could claim a 2020 credit up to $5,000 per employee for the year, and, for 2021, the employer could claim a credit up to $7,000 per employee per quarter.
**Answer:** Admits.

**Complaint Paragraph 18:** Unless otherwise excepted, qualified wages are wages and compensation (subject to Social Security and Medicare taxes) paid by an eligible employer to eligible employees and include the eligible employer's qualified health plan expenses that were properly allocable to such wages.
**Answer:** The United States admits that CARES Act § 2301(c)(5)(A) provides that "wages" generally means wages as defined in 26 U.S.C. § 3121(a) and compensation as defined in 26 U.S.C. § 3231(e). In addition, CARES Act § 2301(c)(5)(A) provides that "wages" include amounts paid by an eligible

ANSWER TO FIRST AMENDED COMPLAINT        8

employer to provide and maintain a group health plan (as defined in 26 U.S.C. § 5000(b)(1)), but only to the extent that the amounts are excluded from the gross income of employees by reason of 26 U.S.C. § 106(a). The United States otherwise denies the allegations in paragraph 18.

**Complaint Paragraph 19:** The ERC was terminated for most employers in the fourth quarter of 2021 by the Infrastructure Investment and Jobs Act ("Infrastructure Act"). *See* IR-2021-242 (Dec. 6, 2021). Under the Infrastructure Act, only a recovery startup business may claim the ERC in the fourth quarter of 2021. *Id.*
**Answer:** Admits.

**Complaint Paragraph 20:** The ERC was available to businesses of many sizes, but an eligible business generally had to meet one of two criteria for a given quarter in 2020 or 2021: (1) a statutorily defined decline in the business's gross receipts when comparing an applicable quarter in 2020 or 2021 with the same quarter in 2019, or (2) the business was fully or partially suspended due to a governmental order during an applicable quarter in 2020 or 2021.
**Answer:** Admits.

**Complaint Paragraph 21:** A business qualifies as an "eligible employer" if it suffered a statutorily required reduction in gross receipts in 2020 and 2021, as compared to 2019. CARES Act § 2301(c)(2)(B); I.R.C. § 3134(c)(2)(A)(ii)(II).
**Answer:** Admits.

**Complaint Paragraph 22:** A qualifying quarter for 2020 is a quarter where the business's gross receipts were 50% less than the same quarter in 2019. CARES Act § 2301(c)(2)(B).

ANSWER TO FIRST AMENDED COMPLAINT          9

**Answer:** Admits.

**Complaint Paragraph 23:** A qualifying quarter for 2021 is a quarter when the business's gross receipts were 20% less than the same quarter in 2019. Relief Act § 207(d); I.R.C. § 3134(c)(2)(A).

**Answer:** Admits.

**Complaint Paragraph 24:** A business also qualifies as an "eligible employer" if it "is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease of 2019 (COVID-19)." CARES Act § 2301(c)(2)(A)(i); I.R.C. § 3134(c)(2)(A)(ii)(I).

**Answer:** Admits.

**Complaint Paragraph 25:** The text of the CARES Act does not require anything additional for a business to qualify as an eligible employer under the suspension criteria.

**Answer:** Denies.

**Complaint Paragraph 26:** In March 2021—roughly a year after Congress passed the CARES Act—the IRS published a 102-page guidance document titled "Notice 2021-20" that addressed the full-or-partial-suspension test. *See* IRS Notice 2021-20 (Mar. 1, 2021).

**Answer:** Admits.

**Complaint Paragraph 27:** The IRS did not follow the Administrative Procedure Act's ("APA") mandatory notice-and-comment process when issuing Notice 2021-

ANSWER TO FIRST AMENDED COMPLAINT          10

20. Notice 2021-20 imposes several arbitrary and capricious requirements not found in either the text of the CARES Act or I.R.C. § 3134.

**Answer:** Denies.

**Complaint Paragraph 28:** Nonetheless, Notice 2021-20 acknowledges several ways in which a business can qualify for the ERC under the suspension test. Notice 2021-20 states that a business is partially suspended if "more than a nominal portion of its business operations are suspended by a governmental order." IRS Notice 2021-20(III.)(C.), Q&A #11.7 A business may be partially suspended "as a result of the inability to obtain critical goods or materials from its suppliers because they were required to suspend operations." *Id.* at Q&A #12. A business can also be partially suspended if government orders required the business to make modifications that have "more than a nominal effect on business operations." *Id.* at Q&A #17.

**Answer:** The United States admits that Notice 2021-20 provides advice on how a business can qualify for the ERC under the suspension test. The United States admits that paragraph 28 takes partial quotes from Notice 2021-20. The United States otherwise denies the allegations in paragraph 28.

**Footnote 7:** Notice 2021-20 arbitrarily defines "a nominal portion" of a business's operations as that portion of a business in which either "(i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts . . . , or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business." IRS Notice 2021-20(III.)(C.), Q&A #11. The statutory text does not impose a "nominal portion" requirement, nor does it impose a numerical threshold.

**Answer:** The United States admits that footnote 7 partially quotes from a portion of Notice 2021-20 in which the IRS explains what it believes constitutes more than

ANSWER TO FIRST AMENDED COMPLAINT          11

a nominal portion of business operations for purposes of the ERC. The United States otherwise denies the allegations in footnote 7.

**Complaint Paragraph 29:** The IRS has decided not to follow the plain text of the CARES Act or its Notice 2021-20.

**Answer:** Denies.

**Complaint Paragraph 30:** In September 2023, the IRS unilaterally announced it was suspending its review and processing of new ERC claims. *See* IR-2023-169 (Sept. 14, 2023). "During the ERC review period, the IRS continued to process claims received prior to September 2023. The agency processed 28,000 claims worth $2.2 billion and disallowed more than 14,000 claims worth more than $1 billion." IR-2024-169 (June 20, 2024). The IRS originally suggested its moratorium would end, and processing would resume, at the beginning of 2024. The IRS did not end the moratorium in 2024. The IRS partially lifted the moratorium for cases filed before January 31, 2024, yet the IRS continues to refuse to adhere to the statute.

**Answer:** The United States admits that in September 2023, the IRS announced a moratorium on processing new ERC claims. The United States admits that on August 8, 2024, it lifted the moratorium for cases filed before January 31, 2024. And the United States admits that paragraph 30 quotes from IR-2024-169. The United States otherwise denies the allegation in Paragraph 30.

**Complaint Paragraph 31:** The IRS has claimed that it continues to process claims filed before the moratorium began on September 14, 2023, but it has done so "at a greatly reduced speed . . . ." IR-2023-169 (Sept. 14, 2023). In practice, the IRS has processed relatively few ERC claims since the moratorium began. The IRS has

ANSWER TO FIRST AMENDED COMPLAINT          12

intentionally stalled the ERC program to such an extent that it has effectively suspended the program altogether.

**Answer:** The United States admits that paragraph 31 quotes a few words from IR-2023-169. The United States otherwise denies the allegations in paragraph 31.

**Complaint Paragraph 32:** Tri-State qualifies for the ERC under the CARES Act because it partially suspended its business due to government orders in the first, second, and third quarters of 2021.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 32.

**Complaint Paragraph 33:** During the pandemic, numerous state government orders partially suspended Tri-State's business operations. The government orders significantly affected Tri-State's operations by requiring Tri-State to isolate COVID-19 patients and cancel non-urgent procedures, reserve beds for COVID patients, reduce Tri-State's usable space due to social distancing and barricade requirements, limit Tri-State's available personnel through quarantine periods and COVID-19 protocols, and divert resources to vaccinate first responders, healthcare professionals, at-risk individuals, and the general community against COVID-19.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 33.

**Complaint Paragraph 34:** On November 25, 2020, the Governor of the State of Washington, Jay Inslee, issued Proclamation 20-24.2 that imposed numerous restrictions from November 2020 to January 2022 on healthcare facilities. Proclamation 20-24.2 required Tri-State to comply with (1) over 30 separate requirements contained within the order itself, (2) guidance issued by the Washington Department of Health ("DOH") and the Washington Department of

ANSWER TO FIRST AMENDED COMPLAINT  13

Labor & Industries ("L&I"), and (3) guidance from the CDC regarding infection prevention and control, risk assessment and work restrictions for healthcare personnel potentially exposed to COVID-19, and the criteria for healthcare workers to return to work.

**Answer:** The United States admits that on November 25, 2020, Governor Inslee issued Proclamation 20-24.2. The United States lacks sufficient information to admit or deny the remaining allegations in paragraph 34.

**Complaint Paragraph 35:** Proclamation 20-24.2 required Tri-State to develop and maintain an "expansion and contraction of care plan" responsive to the community's COVID-19 assessment. Based on the proclamation, one of the following three phases would apply to the Hospital based on COVID assessments: Conventional Care Phase, Contingency Care Phase, or Crisis Care Phase. The Contingency Care Phase required the Hospital to ensure it had a COVID-19 surge capacity of 20 percent to continue providing "all appropriate clinical care" plus sufficient PPE. The Crisis Care Phase prohibited the Hospital from providing non-urgent care with limited exceptions for vaccinations and preventative care.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 35.

**Complaint Paragraph 36:** To determine what Phase the hospital was operating in, Tri-State had to comply with the following monitoring and reporting obligations required by Proclamation 20-24.2:

a. continuously monitor the COVID-19 status in the communities Tri-State serves;

b. continuously monitor capacity in the health care system to ensure there are sufficient resources, including ventilators, beds, PPE, blood and blood products, pharmaceuticals, and trained staff available to combat any potential surges of COVID-19;

ANSWER TO FIRST AMENDED COMPLAINT          14

c. continuously monitor the supply of PPE and maintain sufficient access to PPE; and

d. submit accurate and complete data, as required by any DOH guidelines, to the WA HEALTH data reporting system to allow for a state-wide common operating perspective on resource availability.

If Tri-State failed to comply with these requirements, Proclamation 20-24.2 prohibited it from performing any non-urgent services, procedures, or surgeries.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 36.

**Complaint Paragraph 37:** The monitoring and reporting requirements burdened Tri-State's operations with significant additional work. For example, the Director of Care Transition and Patient Flow at Tri-State reviewed COVID-19 trackers and charts daily to collect COVID-19 data and submit it.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 37.

**Complaint Paragraph 38:** Tri-State diverted significant personnel hours to monitoring the number of available beds, assessing staffing levels to determine whether the Hospital fell within the Contingency Care or Crisis Care Phase, and securing and counting various supplies for COVID patients.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 38.

**Complaint Paragraph 39:** At times throughout 2021, Tri-State was unable to maintain sufficient surge capacity and PPE in the Contingency Care Phase, so it was forced to suspend non-urgent procedures. While "non-urgent," these procedures are neither medically insignificant to patients nor operationally

ANSWER TO FIRST AMENDED COMPLAINT          15

insignificant to Tri-State. For example, Tri-State cancelled surgeries like total knee and hip replacements, knee and hip repairs, hernia repairs, transurethral resections of the prostate, and hysterectomies. This constituted a partial suspension of Tri-State's business operations.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 39.

**Complaint Paragraph 40:** Even when Tri-State was able to perform non-urgent procedures, its operations were still partially suspended.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 40.

**Complaint Paragraph 41:** Due to surges in COVID-19 infection rates, Tri-State refrained from scheduling or cancelled non-urgent procedures during 2021. From January through September of 2021, Tri-State cancelled over 20 non-urgent procedures in compliance with Proclamation 20-24.2 due to lack of sufficient beds or staffing. Canceling procedures like these disrupted the daily work of Tri-State's staff and physicians. Tri-State accordingly tried to avoid cancellations and preempt these disruptions to begin with. Tri-State personnel analyzed Tri-State's COVID-19 infection rates, remaining space (which could be limited by reserves for surge capacity), supplies, and available staff to determine the number, if any, of non-urgent procedures to schedule. Tri-State was forced to materially limit the number of non-essential procedures it scheduled in 2021. These modifications constituted a partial suspension because they affected "more than nominal portions of the business operations." *See* IRS Notice 2021-20 ("For example, an employer that maintains both essential and non-essential business operations, each of which are more than nominal portions of the business operations, may be considered to have a partial suspension of its operations if a governmental order restricts the

ANSWER TO FIRST AMENDED COMPLAINT        16

operations of the non-essential portion of the business, even if the essential portion of the business is unaffected.").

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 41.

**Complaint Paragraph 42:** Despite Tri-State's planning, cancellations were inevitable due to unanticipated positive COVID-19 tests or because a patient experienced COVID-19 symptoms before their appointment or surgery. Tri-State cancelled these non-urgent procedures and appointments in compliance with the CDC's Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic ("Infection Control Recommendations") requirement that the Hospital reschedule patients who exhibited symptoms of or tested positive for COVID-19 within 10 days of their scheduled appointment or procedure. When this happened, it was often not possible for the Hospital to schedule another patient in the patient's place. Each cancelled procedure or appointment that Tri-State was unable to fill represented one less non-urgent patient the Hospital was able to treat that day.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 42.

**Complaint Paragraph 43:** Tri-State's non-essential procedures constituted "more than nominal portions" of its operations. For example, Tri-State's inability to perform non-urgent medical care without interruption during 2021 resulted in a negative budget variance of approximately $4,600,000 from its anticipated in-patient revenue. Tri-State's forecasted in-patient revenue for 2021 was already a pessimistic estimate based on the negative financial impact caused by COVID-19 government orders in 2020. The negative variance of $4,600,000 represents a variance from its already suppressed forecast. Proclamation 20-24.2 partially

ANSWER TO FIRST AMENDED COMPLAINT        17

suspended Tri-State's operations by preventing the Hospital from performing non-urgent procedures during portions of 2021 and requiring the Hospital to divert extensive personnel hours, including overtime hours and travel personnel hours, to comply with the requirements of Proclamation 20-24.2 and other orders.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 43.

**Complaint Paragraph 44:** Proclamation 20-24.2 required Tri-State to "[u]pdate [its] infection prevention policies and procedures" to reflect the CDC's Infection Control Recommendations. In turn, the CDC's Infection Control Recommendations required facilities to "screen and triage everyone entering a healthcare facility for signs and symptoms of COVID-19" by implementing the following procedures:

a. limit and monitor points of entry to the facility,

b. assess everyone entering the facility of symptoms of COVID-19 or exposure to anyone with a confirmed COVID-19 infection,

c. properly manage anyone with a suspected or confirmed COVID-19 infection or who was exposed to a person with a suspected or confirmed COVID-19 infection,

d. isolate patients in an exam room with the door closed, and

e. maintain at least 6 feet of distance between patients waiting for care.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 44.

**Complaint Paragraph 45:** To comply with Proclamation 20-24.2 and the CDC's Infection Control Recommendations, Tri-State implemented COVID-19 procedures. These procedures and their corresponding effects constituted a partial suspension of Tri-State's business and affected more than nominal portions of Tri-State's operations.

ANSWER TO FIRST AMENDED COMPLAINT          18

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 45.

**Complaint Paragraph 46:** Consistent with the CDC's Infection Control Recommendations, Tri-State's policy required it to "screen and triage" everyone entering its facility for "signs and symptoms of COVID-19." As a part of this process, Tri-State (1) limited and monitored its entrances; (2) established and implemented COVID-19 screening procedures for all persons entering the Hospital; and (3) restricted or isolated anyone with a suspected COVID-19 infection. Tri-State positioned its trained screeners at designated entrances within the Hospital. Tri-State's screening procedures required Hospital personnel to ask all persons presenting at Tri-State about the following topics:

a. Contact within the past 14 days with anyone infected with COVID-19 or displaying COVID-19 like symptoms;

b. Positive test for COVID-19 within the past 10 days;

c. Direction from medical professional to monitor or quarantine due to potential COVID-19 infection; and

d. New symptoms from list of symptoms associated with COVID-19.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 46.

**Footnote 8:** Tri-State's Guidance For Severe Acute Respiratory Syndromes, SARS-CoV-1 and SARS-CoV-2, Middle East Respiratory Syndrome (MERS-CoV), and COVID-19 ("COVID-19 Guidance") updated on January 6, 2021

**Answer:** The United States lacks sufficient information to admit or deny the allegations in footnote 8.

**Footnote 9:** Per Tri-State's July 2021 updated screening guidance, fully vaccinated persons who were asymptomatic did not have to quarantine after COVID-19 exposure.

ANSWER TO FIRST AMENDED COMPLAINT        19

**Answer:** The United States lacks sufficient information to admit or deny the allegations in footnote 9.

**Complaint Paragraph 47:** As for hospital patients: if a patient responded "yes" to questions about the above topics, Tri-State quarantined the patient alone in a closed room, and Hospital personnel initiated a series of isolation procedures. The single room limitation reduced Tri-State's room capacity because it could not place another patient into the room, even if the room normally accommodated two patients.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 47.

**Complaint Paragraph 48:** The screening itself, in addition to the questionnaire, was time-consuming. For much of 2021, Tri-State took each patient's temperature, tested the patient for COVID-19, and reported any positive results to the state of residence for the patient.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 48.

**Complaint Paragraph 49:** When possible, Tri-State tried to screen patients by phone before their arrival. Tri-State personnel instructed patients with appointments to call ahead and inform the Hospital if they had any COVID-19 symptoms. Tri-State personnel also called patients the day before their appointments to confirm the patient did not have any new COVID-19 symptoms and rescheduled appointments for any patients with COVID-19 symptoms who were seeking routine medical care or elective medical procedures. In certain cases, Tri-State tested patients multiple times for COVID-19 within a 24-hour period to determine appropriate isolation procedures.

ANSWER TO FIRST AMENDED COMPLAINT          20

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 49.

**Complaint Paragraph 50:** As for non-patient hospital guests: if a visitor responded "yes" to the COVID-19 screening questions, she was denied entry to Tri-State facilities. No visitors were allowed for COVID-19 positive patients except under certain circumstances, including the hospitalization of a minor child, end-of-life care, and visitation essential to a patient's emotional health and well-being. Tri-State maintained a log-book of all visitors who entered patient rooms. **Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 50.

**Complaint Paragraph 51:** Tri-State's screening of visitors and its corresponding review of exceptions, which were performed to comply with CDC guidelines, led to massive administrative problems. Tri-State only granted visitor exceptions after discussions with Infection Control and Public Health personnel. Given their obvious importance to patients and their families, these decisions—determining when a patient was in end-of-life care and who could visit them—required extensive personnel time. And unsurprisingly, disagreements arose from these decisions—further disrupting operations. **Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 51.

**Complaint Paragraph 52:** The disruptive and time-intensive nature of these CDC testing and screening procedures is demonstrated by the fact that Tri-State was forced to hire extra staffing to implement them. Tri-State had to require existing staff to work overtime and double time, hire dedicated screeners, and hire travel health workers. Tri-State spent approximately $240,000 on COVID-19 screeners

ANSWER TO FIRST AMENDED COMPLAINT          21

from January 2021 to June 2021 and a substantial portion of the over $1,000,000 it paid to traveling staff in 2021 to comply with the requirements imposed on the Hospital by Proclamation 20-24.2.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 52.

**Complaint Paragraph 53:** Tri-State had to perform a large volume of COVID-19 tests to comply with the CDC's Infection Control Recommendations. To conduct these tests, Tri-State had to change its Minor Care Center (like an urgent care facility) into a COVID-19 testing facility. Tri-State also used the Minor Care Center for its vaccine clinic as discussed in the Vaccination Clinic and Vaccine Mandate subsection. The required changes to the Minor Care Center created significant demands on personnel that were far more than nominal. In 2021, the Minor Care Center had an increase in overtime and double time hours by 190% compared with 2019.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 53.

**Complaint Paragraph 54:** As a result of having to create a COVID testing and vaccine clinic, the Hospital had to make the minor care practice use the same facility as its family practice department. Combining the minor care and family practice departments reduced the number of patients either department was able to see on a daily basis. The change also created collateral personnel demands on the family practice department. In 2021, the family practice department had an increase of 308% in overtime and double time hours as compared to 2019.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 54.

ANSWER TO FIRST AMENDED COMPLAINT          22

**Complaint Paragraph 55:** To limit the spread of COVID-19 within the Hospital, Proclamation 20-24.2 and the CDC's Infection Control Recommendations required Tri-State to implement a combination of various forms of physical distancing, barriers, and testing. Proclamation 20-24.2 required hospitals to "maintain strict physical distancing in patient scheduling, check-in processes, positioning, and movement within a facility . . . [and] [s]et up waiting rooms and patient care areas to facilitate patients, visitors, and staff to maintain at least six feet of distance between them[,] . . . space out appointments, and consider scheduling or spatially separating well visits from sick visits."

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 55.

**Complaint Paragraph 56:** To comply with these requirements, Tri-State erected physical barriers and enforced social distancing within the waiting rooms for its Emergency, Radiology, Medical Surgical Nursing, and Minor Care departments. Tri-State both replaced and added barriers throughout 2021 to protect staff as masking requirements changed based on vaccination status.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 56.

**Complaint Paragraph 57:** To ensure patients and visitors adhered to social distancing requirements, Tri-State removed up to 50% of the chairs in all of its waiting rooms. These isolation protocols correspondingly limited the number of patients each waiting room could accommodate, which, in turn, limited the number of patients each department could treat per day. Tri-State would not schedule more patients for a department than its waiting room could accommodate. To prevent the patients from overflowing into hallways in violation of Proclamation 20-24.2, Tri-

ANSWER TO FIRST AMENDED COMPLAINT        23

State reduced the number of patients sent per day to any department with a waiting room by up to 50%.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 57.

**Complaint Paragraph 58:** Both individually and collectively, these screening, quarantine, and social distancing procedures required by Proclamation 20-24.2 caused a partial suspension of Tri-State's business.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 58.

**Complaint Paragraph 59:** Unlike other businesses, Tri-State had a duty to treat patients with active COVID-19 infections. To minimize the risk of COVID-19 spreading from infected patients to Hospital personnel, the CDC's Infection Control protocol required Tri-State to place COVID-19 patients in single-person rooms, limit visitors to the facility, prevent visitors of COVID-19 patients from going to locations other than the patient's room within the facility, use dedicated medical equipment for patients with suspected or confirmed COVID-19 infections, vacate rooms of discharged COVID-19 patients until air changes removed infectious particles, perform specialized cleaning and disinfection procedures for surfaces and reusable equipment exposed to infected patients, and exclude personnel with high-risk exposure to COVID-19 from the workplace for 14 days. These requirements reduced the number of Tri-State's rooms that it could use to treat patients and contributed to staffing shortages, which was a suspension of its operations.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 59.

ANSWER TO FIRST AMENDED COMPLAINT          24

**Footnote 10:** CDC required a 14-day quarantine period for high-risk exposures in its "Interim U.S. Guidance for Risk Assessment and Work Restrictions for Healthcare Personnel with Potential Exposure to COVID-19." Proclamation 20-24.2 required Tri-State to follow this CDC guidance.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in footnote 10.

**Complaint Paragraph 60:** To comply with the cleaning requirements, Tri-State implemented disinfection protocols in its COVID-19 Guidance, requiring the nursing department to complete "daily cleans" to minimize the number of staff in hospital inpatient rooms. Environmental Services performed a "terminal clean" of hospital rooms after discharging a patient. Tri-State also treated laundry, food service, and medical waste in compliance with its isolation protocols, including specially labeling all laundry service bags and biohazard waste containers. COVID-19 cleaning and disinfection protocols imposed additional burdens on the Environmental Services staff, which had 1,273 overtime and double time hours in 2021, a 193% increase from 2019, and travel personnel time.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 60.

**Footnote 11:** Based on a revision to Tri-State's COVID-19 Guidance, Environmental Services eventually took over this cleaning task.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in footnote 11.

**Complaint Paragraph 61:** As required by Proclamation 20-24.2, Tri-State followed CDC guidance when transporting COVID-19 patients within the facility or out of the facility. When transporting a COVID-19 patient within the Hospital, both patient and transporter had to wear all necessary personal protective

equipment. These intra-Hospital transport procedures increased patient transport time, which limited the number of patients the Hospital could transport to a particular department within a day. For example, these transport procedures significantly limited the number of patients Tri-State could schedule per day for an MRI or CT Scan. When transferring COVID-19 patients to another facility, Tri-State had to notify the receiving facility and all entities involved in the transport that the patient had or potentially had COVID-19. When appropriate, Tri-State utilized the Lewiston (Idaho) Fire Department to help transfer a COVID-19 patient in an isolation pod. If the fire department was not available, Tri-State had to communicate all isolation and personal protective equipment needs to the transporting facility. These transport and transfer protocols between facilities increased the time it took for Tri-State to clear patients from its beds.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 61.

**Footnote 12:** The CDC's Infection Control Recommendations publication, directly referenced by Proclamation 20-24.2, directs healthcare professional to refer to the CDC's "COVID-19 website" for the transport of COVID-19 patients.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in footnote 12.

**Footnote 13:** Given the burden of these procedures, Tri-State tried to minimize transporting patients when possible by performing certain procedures, such as chest x-rays, within patient rooms.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in footnote 13.

**Complaint Paragraph 62:** To minimize the spread of COVID-19 amongst Tri-State personnel and comply with the CDC's Infection Control Recommendations, Hospital workers had to report any potential COVID-19 exposures of health care

ANSWER TO FIRST AMENDED COMPLAINT          26

workers by calling Tri-State's Employee Health Department. All Tri-State healthcare workers had to sign monthly attestations regarding any illnesses or travel, and all, except for surgeons, were screened upon entry to the facility. Each month, Tri-State personnel had to obtain and file these attestations. Tri-State had to devote substantial time to obtaining monthly attestations. In addition to attestations, Tri-State reported any personnel illnesses or exposures to the appropriate Tri-State supervisor and instructed the worker not to return to work until released by the Employee Health Department. During the first three quarters of 2021, Tri-State sent approximately 100 internal notifications of personnel illnesses or exposures. At a minimum, these reports represented approximately 100 days when a Tri-State personnel member was unable to work due to exposure protocols, which were created to comply with the governmental orders.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 62.

**Complaint Paragraph 63:** Different departments implemented their own screening and reporting requirements. For example, surgeons were screened when they entered the surgical department.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 63.

**Complaint Paragraph 64:** Tri-State's operations were partially suspended because Tri-State was forced to significantly modify more than nominal portions of its operations to comply with the cleaning and disinfection, patient transport, and reporting duties imposed by Proclamation 20-24.2. Tri-State had to restrict available beds. It had to slow room turnover for disinfection, which meant fewer rooms were available. It had to devote numerous additional personnel hours and overtime hours as well as hiring travel healthcare workers to adhere to these

ANSWER TO FIRST AMENDED COMPLAINT          27

protocols. In 2021, Tri-State's employes worked 23,234 overtime and double time hours, which represented a 20 percent increase from 2019. In addition, Tri-State spent a substantial portion of the $1,000,000 paid to traveling staff in 2021 to satisfy the requirements of Proclamation 20-24.2 and the CDC's Infection Control Recommendations.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 64.

**Complaint Paragraph 65:** Proclamation 20-24.2 conditioned Tri-State's ability to perform nonurgent procedures on the distribution of an "effective [COVID-19] vaccine." Complying with this mandate forced Tri-State to partially suspend its operations.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 65.

**Complaint Paragraph 66:** COVID vaccinations themselves diverted Tri-State from its normal operations. Consistent with Proclamation 20-24.2's directive, Tri-State used the Minor Care Center within the Hospital to open a vaccination clinic in December 2020. As discussed earlier, Tri-State had to transform the Minor Care Center into a COVID-19 testing center and vaccination clinic, forcing the Minor Care department to move into the Family Practice department. This relocation reduced the number of patients the Minor Care and Family Practice departments could treat and created logistical issues requiring significant amounts of staff overtime and double time hours.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 66.

ANSWER TO FIRST AMENDED COMPLAINT        28

**Complaint Paragraph 67:** Tri-State was actively vaccinating healthcare workers, first responders, and other persons included by the CDC in "Phase 1A." By January 12, 2021, Tri-State had delivered approximately 500 COVID-19 vaccines. Tri-State personnel monitored patients for at least 15 minutes after they received a COVID-19 vaccination to ensure their safety. Tri-State also started a vaccination hotline to help individuals determine their COVID-19 vaccine eligibility and place them on Tri-State's vaccine waitlist. To comply with CDC guidelines, Tri-State had to divert considerable resources and personnel to screen individuals for vaccine eligibility and properly store and administer the COVID-19 vaccines.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 67.

**Complaint Paragraph 68:** In August 2021, Governor Jay Inslee issued Proclamation 21-14.1, expanding the State of Washington's COVID-19 vaccine mandate to healthcare providers. The mandate required all healthcare providers to be fully vaccinated against COVID-19 and provide their employers with proof of their vaccination status by October 18, 2021, only two months after 21-14.1 issued. To comply with 21-14.1, Tri-State made efforts to ensure every person engaged in work for it was fully vaccinated against COVID-19 and devoted personnel to obtain documentation of "full vaccination against COVID-19" from every Tri-State worker. These vaccination requirements coupled with the short compliance timeline further strained Tri-State's already taxed resources and caused Tri-State to divert resources from other departments of the Hospital causing more than a nominal effect on its business operations.

**Answer:** The United States admits that in August 2021, Governor Inslee issued Proclamation 21-14.1. The United States otherwise lacks sufficient information to admit or deny the allegations in paragraph 68.

ANSWER TO FIRST AMENDED COMPLAINT          29

**Complaint Paragraph 69:** The government orders issued by federal and state entities—including Proclamation 20-24.2 and Proclamation 21-14.1—caused a partial suspension of the Hospital and its operations. The orders led to the cancellation of non-urgent procedures, a reduction in scheduling non-urgent procedures, the loss of beds and space for patients (and visitors), staffing shortages, the loss of the Minor Care Center facility, and the substantial interruption of normal operations.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 69.

**Complaint Paragraph 70:** Tri-State incorporates by reference the allegations in Paragraphs 1 to 69 as if fully set forth herein.

**Answer:** Paragraph 70 requires no response.

**Complaint Paragraph 71:** Tri-State is entitled to a tax refund for the first, second, and third quarters of 2021 under the government-order suspension test of the CARES Act.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 71.

**Complaint Paragraph 72:** Tri-State is an eligible employer for the first, second, and third quarters of 2021 because it "was carrying on a trade or business" during those quarters and its operation during each quarter was "partially suspended" "due to orders from an appropriate governmental authority requiring healthcare facilities to follow restrictive infection prevention protocols due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A).

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 72.

ANSWER TO FIRST AMENDED COMPLAINT          30

**Complaint Paragraph 73:** For determining Tri-State's qualified wages, Tri-State and its wholly owned subsidiaries, Evergreen Estates Retirement & Assisted Living Community, L.L.C. ("Evergreen"), Vannvei, L.L.C ("Vannvei"), and Aquavia, L.L.C. ("Aquavia") constitute a single employer. *See* 26 U.S.C. § 3134(d). During 2019, Tri-State, Evergreen, Vannvei, and Aquavia collectively employed not greater than 500 employees. Consistent with the IRS's guidance, Tri-State, Evergreen, Vannvei, and Aquavia deemed an employee as "full-time" for a calendar month if he or she employed "130 hours of service" for the month. Because Tri-State, Evergreen, Vannvei, and Aquavia together employed "not greater than 500 employees," qualified wages are those "wages paid by such eligible employer with respect to an employee during any period" for which they were fully or partially suspended. 26 U.S.C. § 3134(c)(3)(A)(ii)(I).

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 73.

**Complaint Paragraph 74:** As Tri-State reported in its Forms 941-X, Tri-State's qualified wages for Q1, Q2, and Q3 2021 were $5,302,244, $5,731,721, and $5,439,366, respectively.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 74.

**Complaint Paragraph 75:** None of Tri-State's qualifying wages were paid with payroll costs from the Paycheck Protection Program (PPP) loan forgiveness.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 75.

ANSWER TO FIRST AMENDED COMPLAINT          31

**Complaint Paragraph 76:** Tri-State made timely and proper claims for the ERC with the IRS. The following list shows when Tri-State filed its Forms 941-X with the IRS for each qualifying quarter and the ERC it claimed for each quarter:

a. The 941-X for Q1 of 2021 was filed on January 31, 2024, and it claimed an ERC in the amount of $3,711,570.80 for that quarter.

b. The 941-X for Q2 of 2021 was filed on January 31, 2024, and it claimed an ERC in the amount of $4,012,204.70 for that quarter.

c. The 941-X for Q3 of 2021 was filed on January 31, 2024, and it claimed an ERC in the amount of $3,807,556.20 for that quarter.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 76.

**Complaint Paragraph 77:** Under 26 U.S.C. §§ 7422 and 6532, a taxpayer may commence a refund suit for the recovery of income taxes in federal court after a claim for refund has been filed with the Secretary and six months has elapsed without decision.

**Answer:** The United States admits that under 26 U.S.C. § 6532, no suit under § 7422(a) may begin before the expiration of six months from the date of filing the administrative claim required the IRS renders a decision within that time, nor after the expiration of two years from the date of the IRS mailing by certified mail or registered a notice of the disallowance of the part of the claim to which the suit relates.

**Complaint Paragraph 78:** It has been sixteen months since Tri-State filed its refund claims with the Internal Revenue Service ("IRS"). But the IRS has failed to process Tri-State's valid ERC claims and so, not provided the required refund.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 78.

**Complaint Paragraph 79:** Under 26 U.S.C. § 6611, the United States owes interest on the refund due to Tri-State "from the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days." I.R.C. § 6611(b)(2).

**Answer:** The United States admits that, if it owes a tax refund, it would owe interest from the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days.

**Complaint Paragraph 80:** Tri-State overpaid its taxes and is entitled to the corresponding interest on its overpayment.

**Answer:** The United States lacks sufficient information to admit or deny the allegations in paragraph 80.

**Complaint Paragraph 81:** Tri-State incorporates and realleges paragraphs 1 through 56 above.

**Answer:** Paragraph 81 requires no response.

**Complaint Paragraph 82:** Under 26 U.S.C. § 7430(c)(4)(B), the United States must pay litigation and administrative costs because its position is not "substantially justified." The IRS created a self-imposed moratorium on processing ERC claims, and, as a result, has refused to process straightforward claims like those belonging to Plaintiff.

**Answer:** Denies.

**Complaint Paragraph 83:** Tri-State prays for the following relief:

a. A tax refund in the amounts of $11,531,331.70 for Tri-State's Employee Retention Credit for the following taxable period: Q1, Q2, and Q3 of 2021;

ANSWER TO FIRST AMENDED COMPLAINT        33

b. The interest owed under 26 U.S.C. § 6611 on Tri-State's $11,531,331.70 tax overpayment;

c. Award reasonable attorneys' fees and costs, as allowed by law;

d. Award pre-judgment and post-judgment interest, as allowed by law; and

e. Award such further relief as the Court may deem just and proper.

**Answer:** Paragraph 83 states the relief Tri-States seeks and requires no response.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Tri-State is not entitled to the ERC for periods in which it continued to receive or maintain its usual funding for employee salaries.

### SECOND DEFENSE

To the extent Tri-State claims the ERC based on wages reported as payroll costs to obtain Paycheck Protection Program loan forgiveness, it is not entitled to the ERC.

### THIRD DEFENSE

If the First Amended Complaint makes claims based on any grounds not asserted in a claim for refund filed with the IRS, the Court lacks jurisdiction under 26 U.S.C. § 7422(a) to hear such claims and should dismiss them.

### FOURTH DEFENSE

If the Court determines that Tri-State has made an overpayment of tax, the United States is entitled, pursuant to 26 U.S.C. § 6402, to reduce any such overpayment based on any additional tax liabilities that Tri-State owes, whether or not previously assessed or alleged.

ANSWER TO FIRST AMENDED COMPLAINT 34

FIFTH DEFENSE

If Tri-State establishes that it is entitled to any portion of the ERC claimed, it would not be entitled to deduct, for purposes of income tax for the periods at issue, the amount of wages paid to employees equal to such ERC. Under the doctrine of equitable recoupment, if Tri-State recovers any of the ERC claimed, the amount recovered should be offset by such wages paid to employees.

**DENIAL OF LIABILITY**

The United States denies every other allegation in the First Amended Complaint that it has not specifically admitted in this answer.

WHEREFORE, the United States respectfully requests judgment as follows:

A.    Denial of the relief the First Amended Complaint seeks and entry of judgment in favor of the United States and against Tri-State; and

B.    An award to the United States of costs and other relief the Court deems proper.

Dated June 11, 2026

BRETT SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

/s/ Charles J. Butler
CHARLES J. BUTLER
Tax Litigation Branch
Civil Division, Department of Justice

*Counsel for the United States of America*

ANSWER TO FIRST AMENDED COMPLAINT          35

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2026, I filed the foregoing using the Court's CM/ECF system, which will provide notice to all parties that have appeared.

/s/ Charles J. Butler
CHARLES J. BUTLER
Tax Litigation Branch
Civil Division, Department of Justice

ANSWER TO FIRST AMENDED COMPLAINT        36